IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

MARISOL ANGEL-TAPIA and )
VICTOR LUCHA, individually and )
as parents and next best friends )
of G.L., )
    Plaintiffs, )
)
v. ) Case No. 24-cv-1335
)
ANGELA WESTLAKE, et al., )
    Defendants. )

OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before this Court is Defendants'[1] Motion to Dismiss. (Doc. 20).

## I.   PROCEDURAL BACKGROUND

On September 19, 2024, Plaintiff filed a five-count complaint against the Defendants—who all work for the Department of Children and Family Services ("DCFS")—in their individual capacities. (Doc. 1). In Count I, Plaintiffs argue that Defendants Angie Hamm and Tara Geving conspired with one another to unlawfully seize G.L., who is Plaintiffs' child, from Plaintiffs' custody in violation of their Fourth Amendment rights, and Hamm knowingly and materially withheld information which could have exonerated Plaintiffs during a court hearing. (*Id.* at ¶¶ 98–103). In Count II,

---

[1] The Defendants in this matter are Angie Hamm (listed in this Complaint as "Angela Westlake"), Tara Geving, Tiffany Baker (listed in the Complaint as "Tiffany Nowacki"), and Jenny Metzroth (listed in the complaint as "Jessy Mezroth"). (Doc. 20 at 1). This Court will refer to the Defendants by their names as reflected in the Motion to Dismiss. The Clerk is DIRECTED to amend the names in the docket to reflect the correct names.

Plaintiffs argue all Defendants deprived Plaintiffs of their Fourteenth Amendment right to raise and nurture G.L. (*Id.* at ¶¶ 104–116). Plaintiffs also alleged state law claims of negligence and intentional infliction of emotional distress in the remaining counts. (*Id.* at ¶¶ 117–129).

## II. FACTUAL BACKGROUND

### A. Illinois Abused and Neglected Child Reporting Act

To protect children from abuse and neglect, Illinois enacted the Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq.* Pursuant to ANCRA, DCFS receives reports of child abuse and neglect. 325 ILCS 5/2. DCFS is statutorily mandated "to protect the health, safety and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment and preserve family life whenever possible." *Id.* Certain people under the Act, including medical personnel, are considered "mandated reporters," who are required to report to DCFS if they have "reasonable cause to believe a child known to them in their professional or individual capacity may be an abused child or a neglected child." 325 ILCS 5/4. Upon receiving a report about a child who may have been abused, DCFS's Child Protective Services Unit initiates an investigation. 325 ILCS 5/7.2.

If the Child Protective Services Unit's initial investigation finds a good-faith indication of child abuse or neglect, then a formal investigation begins. 325 ILCS 5/7.4(b)(3). If a child is endangered in his home, an "officer of a local law enforcement

agency" or a "designated employee of the Department" is authorized to take "temporary protective custody of the child without the consent of the person responsible for the child's welfare." 325 ILCS 5/5. Protective custody is authorized if the person taking it "(1) has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health and safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child." *Id.*

Protective custody may be taken prior to the commencement of juvenile court proceedings, but a child taken into protective custody must be taken before a judicial officer for a temporary custody hearing to determine whether custody of the child remains necessary. 705 ILCS 405/2-9. At the temporary custody hearing, a state juvenile court may order a child to be removed from a parent's custody upon finding: (1) "there is probable cause to believe that the minor is abused, neglected or dependent," (2) "[removal] is a matter of immediate and urgent necessity for the safety and protection of the minor," and (3) "reasonable efforts have been made or that . . . no efforts reasonably can be made to prevent or eliminate the necessity of removal of the minor from his or her home." 705 ILCS 405/2-10(2).

"When [DFCS] first assumes custody of a child, in placing that child under [the] Act, [DCFS] shall make reasonable efforts to identify, locate, and provide notice to all adult grandparents and other adult relatives of the child who are ready, willing and able to care for the child." 20 ILCS 505/7(b). Those efforts must be renewed each time the child requires a placement change. *Id.* Additionally, DCFS "must document its efforts to

identify, locate, and provide notice to such potential relative placements and maintain the documentation in the child's case file." *Id.* If DCFS "determines that a placement with any identified relative is not in the child's best interests or that the relative does not meet the requirements to be a relative caregiver, as set forth in Department rules or by statute, [DCFS] must document the basis for that decision and maintain the documentation in the child's case file." *Id.*

### B. Relevant Facts

Plaintiffs Marisol Angel-Tapia and Victor Lucha are the biological parents of G.L., who was born in 2022 into a Spanish-speaking household. (Doc. 1 at ¶¶ 23, 27, 55). On July 11, 2023, when G.L. was seven months old, Angel-Tapia took him to a clinic because she had concerns about a potential sunburn on his right arm and armpit area. (*Id.* at ¶¶ 23–25). While assessing the injuries, Nurse Practitioner Courtney Elliot noticed bruising in the shape of a handprint on G.L.'s right leg and that he had a limited range of motion in his right arm. (*Id.* at ¶ 26). Angel-Tapia reasoned the bruising was probably due to mosquito bites. (*Id.* at ¶ 28).

NP Elliot was concerned about Angel-Tapia's explanation of G.L.'s condition, so she made a hotline call to DCFS to report potential signs of abuse or neglect. (*Id.* at ¶ 29). DCFS began an investigation into these allegations. (*Id.* at ¶ 33). Defendants Hamm and Geving were assigned to the investigation. (*Id.* at ¶¶ 34–35). G.L. was taken into custody by DCFS and transferred to St. John's Hospital, where Angel-Tapia was not allowed to be alone with him. (*Id.* at ¶¶ 31–32). She was also not allowed to breastfeed him. (*Id.* at ¶ 41). When hospital staff attempted to bottle-feed him, G.L. could not adjust to the bottle

and formula, so he was not able to eat. (*Id.*). When Lucha arrived at St. John's Hospital, he told investigators G.L. burned his arm on a metal pole. (*Id.* at ¶ 39).

On July 12, 2023, Hamm and Geving took G.L. into protective custody pending results of further medical consultations. (*Id.* at ¶ 43). Hamm requested a consultation from Dr. Channing Petrak, who acts as a forensic consultant for DCFS. (*Id.* at ¶¶ 44–45). Dr. Petrak indicated the burn to G.L.'s right arm "does not appear to be inflicted due to no [sic] pattern; the burn is of an unknown origin"; and "the marks on [G.L.'s] leg are not bruising, the distribution of the marks is odd to be an inflicted injury." (*Id.* at ¶ 48). Dr. Petrak had also asked whether G.L. had contact with citrus juice, consistent with a skin condition called phytophotodermatitis. (*Id.* at ¶¶ 47, 79–80, 85–86).

On July 13, 2023, a temporary custody hearing was held in Cass County Circuit Court. (*Id.* at ¶ 51). During the hearing, Hamm testified but failed to mention Dr. Petrak's findings or the absence of evidence for acute or old fractures. (*Id.* at ¶¶ 52–53). That same day, G.L. had a feeding tube inserted due to his failure to eat. (*Id.* at ¶ 54). On July 17, 2023, G.L. was released from St. John's and placed into an English-speaking foster household, despite the availability of family members who were able to take G.L. into their homes. (*Id.* at ¶¶ 55–56).

On July 20, 2023, Defendants Metzroth and Baker were assigned to G.L.'s case. (*Id.* at ¶ 58). Plaintiffs gave Baker a list of potential family members who were able to take in G.L. and asked her to screen those family members for placement. (*Id.* at ¶ 59). On August 4, 2023, G.L. was placed with his cousin Yulissa Miron. (*Id.* at ¶ 64). DCFS later began an investigation into Miron for medical neglect after she waited three days to take G.L. to

the hospital after G.L. pulled out his feeding tube. (*Id.* at ¶¶ 65–66). As a result, G.L. was removed from Miron's care by Hamm and Geving. (*Id.* at ¶¶ 68, 71). After the investigation, Hamm and Geving recommended G.L. be placed in a traditional foster home, without any family members. (*Id.* at ¶ 74). "All [three] homes in which G.L. was placed from August 2023, until October 3, 2023, were non-Spanish speaking [foster] homes." (*Id.* at ¶ 84).

On September 22, 2023, Lucha requested a service appeal challenging the validity of his indication for medical neglect. (*Id.* at ¶ 78). On September 22, 2023, during a hearing on the appeal, Dr. Bryan Albracht testified the marks on G.L.'s leg and arm, were consisted with phytophotodermatitis, which causes the pigmentation of the skin to change upon contact with citrus. (*Id.* at ¶¶ 79–80). On October 2, 2023, Dr. Petrak ordered further testing and noted the injuries could be consistent with phytophotodermatitis. (*Id.* at ¶¶ 85–86). On October 3, 2023, the Cass County State's Attorney's Office moved to dismiss the Petition for Adjudication of Wardship, which the court granted. (*Id.* at ¶ 87). On December 11, 2023 and January 19, 2024, the cases against Lucha and Angel-Tapia, respectively, were dismissed by DCFS as unfounded. (*Id.* at ¶¶ 91–92).

### III. DISCUSSION

#### A. Legal Standard

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *See Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 458 (7th Cir. 2007). When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the plaintiff, accepting all well-pleaded allegations as true, and construing

all reasonable inferences in plaintiff's favor. *Christensen*, 483 F.3d at 458. To state a claim for relief, a plaintiff need only provide a short and plain statement of the claim showing he is entitled to relief and giving defendants fair notice of the claims. *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). However, the complaint must set forth facts that plausibly demonstrate a claim for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A plausible claim is one that alleges factual content from which the court can reasonably infer that defendants are liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Exhibits Attached to Defendants' Motion to Dismiss

In support of their Motion to Dismiss, Defendants provide several documents from the underlying custody case. These documents include: the petition for adjudication of wardship; a transcript of the proceedings on July 13, 2023; the temporary custody order entered on July 13, 2023; and appearance orders from July 26, 2023, and August 16, 2023.

Rule 201(b)(2) of the Federal Rules of Evidence permits a court to take judicial notice of facts which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Generally, a court may not consider exhibits attached to a motion to dismiss without converting it into a motion for summary judgment. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). But it is "well established that judges may take judicial notice of matters of public record when ruling on a motion to dismiss" without converting it into a motion for summary judgment. *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022).

Here, Plaintiffs do not dispute these documents may be judicially noticed. Instead, Plaintiffs argue the Court should not consider these exhibits because they were created *after* the date in which Plaintiffs allege their claims originate, making the exhibits "extraneous." But Plaintiffs fail to cite to any case to support their temporal argument as preventing judicial notice. Therefore, the Court will take judicial notice of the juvenile court documents.

### C. Analysis

Section 1983 holds defendants acting under color of state law liable where they "subjected or caused to be subjected, any citizen . . . or other person . . . to the deprivation of any rights" guaranteed by federal law. 42 U.S.C. § 1983. In this case, Plaintiffs assert violations of their Fourth and Fourteenth Amendment rights. Defendants argue the claims against them should be dismissed for several reasons. First, Hamm and Geving's decision to take G.L. into protective custody was reasonable given the opinion of his treating physician, and thus did not violate the Fourth Amendment. Second, Defendants' actions did not violate Plaintiffs' substantive or procedural due process rights under the Fourteenth Amendment. Third, the Eleventh Amendment prohibits Plaintiffs' claims against Defendants because it is nominally a suit against DCFS, a state agency. Finally, the state law claims are barred by sovereign immunity.[2]

---

[2] Defendants also argue that several facts alleged by Plaintiffs are conclusory or unsupported. To the extent that the allegations are conclusory, the Court shall disregard them. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

1. **Fourth Amendment Claim**

The Fourth Amendment, incorporated against the States by the Fourteenth Amendment, guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. The prohibition against unreasonable searches and seizures applies to both civil and criminal investigations conducted by the government and therefore applies to DCFS employees. *Heck*, 327 F.3d at 509. In the context of a DCFS investigation, a seizure under the Fourth Amendment occurs when a child is removed from their home and family. *Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011). Defendants' removal of G.L. from his parents' custody thus qualifies as a seizure. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000).

In addition to proving a seizure has occurred, a plaintiff must demonstrate that the seizure was unreasonable. *Id.* To be considered *reasonable*, the seizure must either be pursuant to a court order, justified by exigent circumstances, or supported by probable cause. *Hernandez*, 657 F.3d at 474–75. Here, Defendants contend the seizure was supported by probable cause.

A probable cause analysis is an objective inquiry. *Siliven v. Ind. Dep't of Child Serv.*, 635 F.3d 921, 927 (7th Cir. 2011). A court's "focus is on the facts and circumstances known to defendants at the time they decided to remove [the child], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Id.* "Unreasonableness" under the Fourth Amendment "is not capable of precise definition or mechanical application, and its proper application requires careful attention to the facts and circumstances of each

particular case." *Brokaw*, 235 F.3d at 1010 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

According to the Complaint, G.L. was removed from their custody after NP Elliot noticed the burn on his arm, bruising in the shape of a handprint on his right leg, and a limited range of motion in his right arm. Angel-Tapia stated the cause of the injuries were sunburns and mosquito bites. Based on her medical experience, NP Elliot was concerned about Angel-Tapia's explanation, so she called DCFS. Although there was a language barrier, Angel-Tapia does not allege that NP Elliot misunderstood her. In fact, at St. John's Hospital, the admitting physician also believed the sunburn explanation was inconsistent with G.L.'s condition. Additionally, when Lucha arrived, he provided a different explanation for the source of the burn—stating it was caused by a hot metal pole. Based on the conflicting statements and the opinions of the medical providers,[3] a reasonable caseworker could have believed G.L. faced an immediate threat of abuse at the time of the seizure.

However, even if probable cause justified G.L.'s seizure, the manner in which the defendants seized G.L. may still make his seizure unreasonable. *See Id.*at 1011 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("[R]easonableness depends on not only when a seizure is made, but also how it is carried out[.]")). Plaintiffs argue the manner in which G.L. was seized was unreasonable for several reasons. Plaintiff Angel-Tapia was unable to breastfeed G.L. or provide her pumped breastmilk to him because Defendants

---

[3] Because Dr. Petrak's findings were communicated to DCFS after the seizure occurred, it is not appropriate to consider those findings for purposes of the reasonableness analysis, as only those facts and circumstances known at the time of the seizure are relevant. *See Siliven*, 655 F.3d at 927.

allegedly prevented her from doing so. As a result, G.L. required a feeding tube because he was not adjusting to a provided bottle-fed formula. Plaintiffs cite *Brokaw* in support of the proposition, but that case concerned *how* the defendants unreasonably seized the minor: "dressing in plain clothes, driving an unmarked car, entering his home in the evening without knocking or identifying themselves, and then refusing to do so when asked" and finally "remov[ing] the screaming children from the home without explanation." *Id.* at 1012. The Seventh Circuit described the manner in which the minor was seized as akin to kidnapping. *Id.* Plaintiffs here allege no facts to suggest that the *manner* in which Defendants seized G.L. was unreasonable and, as a result, fail to state a Fourth Amendment claim.

### 2. Substantive Due Process Claim

In addition to their Fourth Amendment claim, Plaintiffs assert a Fourteenth Amendment substantive due process claim. To the extent that claim is premised on the seizure of G.L., however, it cannot succeed because "substantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon. *Id.* at 1017 (citing *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). A portion of Plaintiffs' Fourteenth Amendment arguments focus on the lack of probable cause to support the initial seizure. Those issues cannot be considered under the Fourteenth Amendment's framework because the Fourth Amendment protects those rights. *Id.* However, Plaintiffs also assert their rights were violated during the entire period of government-forced separation, which does implicate their Fourteenth Amendment rights.

The Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs allege substantive due process claims based on Defendants' infringement of their familial rights. *See Hernandez*, 657 F.3d at 478. "The Supreme Court has long recognized, as a component of 'substantive' due process, that parents have a liberty interest in familial relations." *Doe v. Heck*, 327 F.3d 492, 517 (7th Cir. 2003). This right is an aspect of substantive due process and includes the parents' right "to bear and raise their children" and the child's right "to be raised and nurtured by his parents." *Id.* at 517–18. However, this right is "limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents." *Brokaw*, 235 F.3d at 1019. However, it "does not include the right to be free from child abuse investigations." *Heck*, 327 F.3d at 520.

"[W]hen analyzing a familial relations claim, a 'balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse.'" *Id.* (quoting *Brokaw*, 235 F.3d at 1019). To achieve this balance, caseworkers must have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019. The caseworker must have "more than a hunch but less than probable cause." *Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012). But even when the initial seizure is supported

by reasonable suspicion, "the continued withholding of a minor may constitute a constitutional violation where . . . reasonable suspicion dissipates."[4] *Id.* at 291.

For example, in *Hernandez*, the Seventh Circuit found although there was probable cause when a child was initially seized, the probable cause had dissipated by the next day. 657 F.3d at 480. In that case, an orthopedic doctor informed the caseworker after the seizure that the child's injury "did not look like any abuse or neglect." *Id.* Later, a full-body x-ray revealed normal results. *Id.* Based on that, the State's Attorney did not file a petition for protective custody. *Id.* Nevertheless, the caseworker did not release the child to his parent's custody. *Id.* As a result, the Seventh Circuit found that a trier of fact could determine that probable cause dissipated and the caseworkers were no longer justified in withholding the child. *Id.*

As discussed, the DCFS agents had probable cause—more than reasonable suspicion—to justify their initial decision to remove G.L. from his parents' custody. As the investigation went on, however, the DCFS agents sought Dr. Petrak's opinion, which indicated G.L.'s injuries were inconsistent with abuse. Dr. Petrak also specifically asked whether G.L. came into contact with citrus juice, which suggests he believed phytophotodermatitis could have been a factor in the injuries rather than any abuse. X-rays additionally showed that G.L. did not have any broken bones. When construing

---

[4] To clarify the applicable legal standards, the Seventh Circuit has explained that parents' claims concerning "continuing separation" from their children are "properly analyzed under the Fourteenth Amendment" where the proper standard is reasonable suspicion. *Xiong*, 700 F.3d at 291–92. A child's claim for "continued withholding" is instead analyzed for probable cause under the Fourth Amendment. *Id.* Allegations concerning the initial removal of a child, moreover, are evaluated under the Fourth Amendment. *Id.* at 291 n.2.

these facts in the light most favorable to Plaintiffs and accepting all well-pleaded facts as true, a reasonable caseworker could have believed that reasonable suspicion and even probable cause dissipated after the initial seizure. *See Xiong*, 700 F.3d at 292. Therefore, Defendants' Motion to Dismiss is denied as to this count.

### 3. Procedural Due Process Claim

The Fourteenth Amendment protects against the deprivation of constitutionally protected interests without due process of law. *Brokaw*, 235 F.3d at 1020. Due process claims are subject to a two-part inquiry. *Id.* The Court must determine (1) whether plaintiffs were deprived of a protected liberty or property interest and, if so, (2) the Court must then decide what process was due. *Id.*

Plaintiffs allege a deprivation of their right to familial relations, which is a protected liberty interest. *Id.* at 1020. In considering what process is due for the deprivation of this liberty interest, the Seventh Circuit has reasoned that both parental rights, and a child's right to be nurtured by his parents cannot be denied "without an opportunity to be heard in a meaningful way." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The amount of due process required varies with any particular situation and is a "flexible" concept. *Id.* At a minimum, however, due process in this setting "requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Id.*; *see also Hernandez*, 657 F.3d at 484.

In *Brokaw*, the Seventh Circuit found the plaintiff's allegations were sufficient to state a procedural due process claim. 235 F.3d at 1021. Specifically, the allegations "call[ed] into question the constitutional adequacy of the post-deprivation hearing: [the

plaintiff] contend[ed] the defendants filed or conspired to file false statements with the court"; "the social study prepared concerning [the minor] and his sister was not provided to his parents prior to the custody hearing"; and "the court relied in part on this study to order him a ward of the state." *Id.* The Seventh Circuit, however, explained that while the social worker would not be protected by absolute immunity for her role in initiating the removal or gathering evidence, she would be absolutely immune as to her involvement in the judicial process. *Id.* at 1014 n.10.

Absolute immunity "confers complete immunity from suit, not just a mere defense to liability and is applicable in suits under section 1983 . . . ." *Dawson v. Newman*, 419 F.3d 656, 660 (7th Cir. 2005). For example, "social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court." *Millspaugh v. Cty. Dep't of Pub. Welfare of Wabash Cty.*, 937 F.2d 1172, 1176 (7th Cir. 1991).

In *Millspaugh*, the Seventh Circuit considered allegations that a social worker pursued custody proceedings involving the plaintiffs' children because she disliked the plaintiffs' religion, "failed to furnish the court with material which would have been favorable to the plaintiffs during the custody proceedings," and "neglected to ensure that the [plaintiffs] received adequate notice of [the custody] hearings." *Id.* at 1175. The plaintiffs argued that even though the social worker's actions occurred in connection with judicial proceedings, the actions were so clearly unlawful that absolute immunity should not apply. *Id.* The Seventh Circuit disagreed, reasoning that "immunity that applies only when the defendant did no wrong is no immunity at all." *Id.* The court found that "[the

social worker's] motives in asking the court to do certain things, and her selection of evidence to present, lie at the core of the subjects to which absolute immunity applies." *Id.* The court reasoned that even assuming the social worker acted out of improper motive and misled the court, "social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court." *Id.* at 1176.

Here, like *Millspaugh*, Plaintiffs allege Hamm misled the court by presenting incomplete testimony during the protective custody hearing. Because these allegations involve her "testimony and other steps taken to present the case for decision by the court," she is shielded by absolute immunity for her testimony. *Millspaugh*, 937 F.2d at 1176; *see also Brewer v. Sproat*, No. 15-3332, 2017 U.S. Dist. LEXIS 79414, at *11 (C.D. Ill. May 24, 2017) (citing *Millspaugh*, 937 F.2d at 1175–76; *Pelham v. Albright*, No. 11 CV 99, 2012 U.S. Dist. LEXIS 63848 (N.D. Ind. May 4, 2012)) (child welfare specialist found absolutely immune from damages action after "allegedly lying under oath and presenting allegedly false drug test results to the juvenile court judge"). Accordingly, the Motion to Dismiss is granted with respect to the procedural due process claim against Hamm.

### 4. Eleventh Amendment

Defendants argue that, even though they are being sued for damages in their individual capacities, they are still shielded by the Eleventh Amendment. "The Eleventh Amendment bars private litigants' suits against nonconsenting states in federal courts, with the exception of causes of action where Congress has abrogated the states'

traditional immunity through its powers under the Fourteenth Amendment." *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). State officials sued in their individual capacities "are 'persons' within the meaning of § 1983" and the "Eleventh Amendment does not bar such suits." *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "But even when a suit is against a public officer in his or her individual capacity, the court is obliged to consider whether it may really and substantially be against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001). "[A] suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 n.11 (1984)). That said, "[t]he general rule is that" suits against state officials in their individual capacities "are not barred by the [Eleventh] [A]mendment, because the plaintiff is seeking damages from individuals rather than from the state treasury." *Id.* at 1022–23. This is true even if "the state chooses to indemnify its employees" and "the judgment may exceed the employee-defendant's capacity to pay unless he is indemnified." *Id.* at 1023.

Here, Defendants argue the practical effect of this suit deters other DCFS agents from their enforcement of ANCRA. But the Complaint does not amount to the type of "generalized attack on" DCFS that the Eleventh Amendment bars; it instead alleges "the manner in which the individual DCFS employees administered the reporting and investigatory scheme" violated Plaintiffs' constitutional rights. *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 613 n.9 (7th Cir. 2002). Thus, the suit here is properly against

Defendants in their individual capacities, and these Defendants are not protected by the Eleventh Amendment. *See Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) ("[I]ndividual capacity suits do not implicate the Eleventh Amendment's protections[.]"); *Brokaw*, 235 F.3d at 1009 (permitting familial integrity claim against state officials in their individual capacities).

### 5. State Law Claims

Finally, Defendants argue Plaintiffs' state law claims are ones against the State, subject to sovereign immunity.

The State Lawsuit Immunity Act provides in part that "the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1. The Illinois Court of Claims has "exclusive jurisdiction" over "[a]ll claims against the State founded upon any law of the State of Illinois." 705 ILCS 505/8(a). In *T.S. v. County of Cook*, the Seventh Circuit held that "[t]he prohibition against making the State of Illinois a party to a suit cannot be evaded by making an action nominally against the agents of the State when the real claim is against the State itself . . . ." 67 F.4th 884, 891 (7th Cir. 2023). The Court explained that a lawsuit brought against a state employee is considered, for these purposes, one impermissibly against the State when:

> [T]here are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.

*Id.* at 892 (quoting *Healy v. Vaupel*, 133 Ill. 2d 295, 309 (Ill. 1990)).

In addressing whether a state employee acted beyond the scope of her authority, the relevant inquiry is whether "the employee intended to perform some function within the scope of his or her authority when committing the legal wrong." *Id.* The State, through DCFS, has the sole authority to investigate allegations of child abuse and take action to remove children from their guardians if necessary. 20 ILCS 505/21. Thus, the instant allegations all occurred during the scope of Defendants' authority as DCFS workers. And as to the official-functions element, the relevant inquiry is whether the breach involved matters "ordinarily within . . . the normal and official functions" of Defendants' roles at DCFS. *T.S.*, 67 F.4th at 893. The investigation here into allegations of child abuse and the removal of G.L. involved the normal functions of Defendants' roles as DCFS workers.

Where the alleged wrongful conduct "arose out of the State employee's breach of a duty that is imposed on [them] solely by virtue of [their] State employment," sovereign immunity bars the action in circuit court. *Id.* at 892. But "where the employee is charged with breaching a duty imposed on [them] independently of [their] state employment, sovereign immunity will not attach." *Id.* Plaintiffs argue that *Paulinski v. Paulinski*, No. 2024-L-241 (Cir. Ct. Cook County), establishes that DCFS workers are held to a separate duty of care based on the Child Welfare Education Licensure standards. However, Plaintiffs did not allege in the Complaint that Defendants breached those standards. Instead, Plaintiffs cite to numerous statutes establishing guidelines for how DCFS workers should determine placement for children and how they should conduct their investigations. Therefore, the source of the duty which was imposed was based solely by

virtue of their position as DCFS employees. Because all three elements are satisfied, the state law claims are dismissed pursuant to Illinois's State Lawsuit Immunity Act.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 20) is GRANTED in part as to Plaintiffs' Fourth Amendment claim, Fourteenth Amendment procedural due process claim, and state law claims. Plaintiffs' state law claims are dismissed with prejudice. Plaintiffs may amend their Complaint within 21 days after the entry of this order to cure deficiencies. Defendants' Motion is DENIED in part as to Plaintiffs' Fourteenth Amendment substantive due process claim.

ENTER: September 30, 2025

_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE