E-FILED
Wednesday, 23 September, 2026 03:35:58 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **MARISOL ANGEL-TAPIA and VICTOR LUCHA, individually and as parents and next best friends of G.L., Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 24-cv-1335** |
| **ANGELA WESTLAKE, et al., Defendants.** | ) | |

# OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Defendants'[1] Motion to Dismiss the First Amended Complaint (Doc. 59). Plaintiffs Marisol Angel-Tapia and Victor Lucha,[2] individually and as parents and next best friends of their child, G.L., bring this action against Defendants following Defendants' placement of G.L. into protective custody. For the following reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.

## I. FACTUAL BACKGROUND

On July 4, 2023, G.L. was 7 months old and had been exclusively breastfed by his mother. (Doc. 48 at ¶ 27). On that day, G.L. and his parents picnicked in the sun and, in

[1] The Defendants are Angie Hamm (formerly Angela Westlake), Tara A. Geving, Tiffany Baker (formerly Tiffany Nowacki), and Jenny Metzroth. Although the First Amended Complaint uses Hamm's and Baker's former names, and refers to Metzroth as "Mezroth," this Opinion uses the names identified in Defendants' pleadings. At all times relevant, Hamm was a Case Investigator for the Illinois Department of Children and Family Services ("DCFS"), Geving was a Public Service Administrator for DCFS, and Baker and Metzroth were Caseworkers for DCFS. (Doc. 48 at ¶¶ 4–7).

[2] Tapia and Lucha are collectively referred to as G.L.'s parents unless otherwise indicated. Tapia is the biological mother of G.L. and Lucha is the biological father of G.L. (Doc. 48 at ¶¶ 2–3).

the days thereafter, his parents observed irritation and blistering on G.L.'s left armpit area that they thought was a sunburn or caused by contact with a hot metal pole. (*Id.* at ¶¶ 28–29, 34, 46). Tapia sought medical assistance from G.L.'s established primary care provider, Courtney Elliot, NP ("NP Elliot"), at Elmer High Taylor Clinic. (*Id.* at ¶ 31). NP Elliot ordered x-rays[3] on G.L.'s limbs and reported potential abuse and neglect to DCFS. (*Id.* at ¶ 35). DCFS began an investigation wherein Hamm was assigned as the Child Protective Investigator and Geving was assigned as the supervisor, or Public Service Administrator. (*Id.* at ¶¶ 36–38). Geving and Hamm requested Tapia and G.L.'s paternal aunt, Tania Lucha, enter into a safety plan with DCFS for G.L., wherein G.L.'s parents were not permitted to be alone with him unless Tania was there to supervise. (*Id.* at ¶ 39). Tapia and Tania agreed to the safety plan. (*Id.* at ¶ 40).

On DCFS's instruction, G.L. was taken to St. John's Hospital. (*Id.* at ¶¶ 35, 41–43). A bone survey x-ray was conducted which resulted in no observed fractures or abnormalities. (*Id.* at ¶ 48). Hamm documented in her investigation report that there was "confirmed bruising to [G.L.'s] right femur." (*Id.* at ¶ 51). Dr. Channing Petrak evaluated G.L. and found the markings were inconsistent with inflicted injury. (*Id.* at ¶ 54). Dr. Petrak questioned whether G.L. had been in contact with citrus juice, as children and those with sensitive skin may experience a reaction called "phytophotodermatitis," resulting from sun exposure to an area of the skin that had touched citrus juice. (*Id.* at ¶¶

[3] A couple hours later, but before G.L.'s transportation to St. John's Hospital, G.L.'s x-rays established no fractures or abnormalities to his limbs. (Doc. 48 at ¶ 41).

54–55). At that time, Dr. Petrak did not know G.L. had been in the sun and exposed to citrus juice on July 4, 2023. (*Id.* at ¶¶ 55–56). Dr. Petrak's findings were relayed to Hamm on July 12, 2023, at 12:07 p.m. (*Id.* at ¶ 57). No follow up occurred concerning the citrus juice inquiry. (*Id.* at ¶ 58).

At approximately 12:36 p.m. on July 12, 2023, Hamm allegedly "fabricated" a report indicating bruising to G.L.'s right femur had been corroborated. (*Id.* at ¶¶ 60, 62). G.L. was then removed from his parents at Hamm's direction and placed into protective custody with DCFS. (*Id.* at ¶ 68). G.L. was housed in five different foster homes from July 12, 2023, until his return to his parents on October 3, 2023.[4] (*Id.* at ¶¶ 21, 72).

Hamm relayed the bruising report she had drafted to the Cass County State's Attorney's Office (the "CCSAO"). (*Id.* at ¶ 78). She did not inform the CCSAO about the x-ray scans[5] or Dr. Petrak's specific findings concerning the irritation on G.L.'s left armpit and the citrus juice inquiry. (*Id.* at ¶¶ 78–85). The CCSAO then prosecuted G.L.'s parents for abuse and neglect. (*Id.* at ¶ 86). A temporary custody hearing was held on July 13, 2023, wherein the juvenile court found probable cause existed to remove G.L. and the CCSAO's Petition for Adjudication of Wardship was granted. (*Id.* at ¶¶ 87, 155, 158). In testifying for the CCSAO, Hamm purportedly "withheld and suppressed the exculpatory evidence she discovered" before the hearing and "she fabricated the reasoning behind why she felt protective custody of G.L. was urgent and necessary." (*Id.* at ¶ 157).

[4] G.L.'s parents raised him in a Spanish-speaking household. Just one of the five foster homes was a Spanish-speaking, family placement. (Doc. 48 at ¶¶ 21, 26, 72). G.L. was not placed with Tania. (*Id.* at ¶ 76).
[5] A CT scan indicating no abnormalities was also performed on G.L.'s head. Allegedly, this was not relayed to the CCSAO either. (*Id.* at ¶¶ 79–80, 85).

Approximately a day into protective custody, G.L. continued to refuse bottle feeding. (*Id.* at ¶ 88). Hamm did not allow Tapia to breastfeed G.L. or attempt to bottle feed G.L. with her own breastmilk. (*Id.* at ¶¶ 88–89). Due to the bottle-feeding difficulties, Hamm authorized a surgical procedure in which a nasogastric feeding tube was inserted into G.L.'s stomach. (*Id.* at ¶ 90). G.L. later suffered complications as a result. (*E.g.*, *id.* at ¶¶ 90, 92–93, 105–08). G.L. was discharged from the hospital on July 17, 2023, and placed into foster care. (*Id.* at ¶ 91). Defendants Metzroth and Baker were assigned as Caseworkers in the matter for DCFS. (*Id.* at ¶ 95). G.L. was soon taken to another hospital for complications with his feeding tube and, on July 22, 2023, he was transferred to another foster placement. (*Id.* at ¶¶ 93–94, 98). Defendants allegedly did not "identify, locate, and provide notice" to G.L.'s adult relatives before this new placement. (*Id.* at ¶¶ 95–97).

On July 26, 2023, Lucha's now-retained counsel provided Baker with a formal list of family members available to take G.L.[6] (*Id.* at ¶ 99). On August 4, 2023, G.L. was placed with his paternal cousin, Yulissa Miron. (*Id.* at ¶ 101). Several days later, Miron took G.L. to the hospital to replace G.L.'s feeding tube after G.L. pulled it out. (*Id.* at ¶¶ 108, 110). DCFS then began an investigation against Miron for medical neglect after receiving a hotline call. (*Id.* at ¶ 103). Hamm and Geving were assigned to the investigation and recommended G.L.'s removal from Miron. (*Id.* at ¶¶ 112–13). On August 17, 2023, G.L.

[6] Plaintiffs allege Baker purposefully did not attempt to contact any of the listed family members until at least five days later and, additionally, Defendants "fabricated their findings that these individuals were somehow unfit." (*Id.* at ¶¶ 99–100).

was removed from Miron. (*Id.* at ¶ 114). G.L. was transferred two more times to new foster parents. (*Id.* at ¶¶ 114–15).

DCFS records from September 15, 2023, indicated that G.L. had been in contact with lime juice (citrus) on July 4, and phytophotodermatitis was likely impacting his skin. (*Id.* at ¶ 118). Lucha appealed his indication for medical neglect of G.L. and a court hearing was held on September 22, 2023. (*Id.* at ¶¶ 116, 124). Dr. Bryan Albracht testified that G.L.'s alleged injuries were consistent with phytophotodermatitis. (*Id.* at ¶ 125–27). On October 2, Dr. Petrak authored a report documenting her July assessment of G.L. stating his markings "did not appear abusive in nature" and that "information has not been received" as to her inquiry about the citrus juice, as the alleged injuries "could be consistent with phytophotodermatitis or irritant contact dermatitis." (*Id.* at ¶¶ 128–29). CCSAO's voluntary motion for dismissal of its Petition for Adjudication of Wardship was granted the next day. (*Id.* at ¶ 130). On December 11, 2023, and then on January 19, 2024, DCFS voluntarily dismissed its investigations against Lucha and Tapia, respectively, as "unfounded." (*Id.* at ¶¶ 135–36).

## II. PROCEDURAL BACKGROUND

The Court previously dismissed portions of Plaintiffs' first complaint in its September 30, 2025 Opinion. Plaintiffs filed the instant amended complaint with leave of court on November 11, 2025, which Defendants moved to dismiss. Plaintiffs' claims are structured as follows: 1) The Parents' unlawful seizure claim on behalf of G.L. against Hamm and Geving; 2) Plaintiffs' unlawful continued seizure claim on behalf of G.L.

against all Defendants; 3) Plaintiffs' substantive due process claim (child medical decisions) on behalf of G.L. against all Defendants; 4) The Parents' Fourteenth Amendment claims against all Defendants; 5) Plaintiffs' § 1985 conspiracy claim against all Defendants; 6) The Parents' malicious prosecution claim against all Defendants; 7) The Parents' state law malicious prosecution claim against all Defendants; and 8) Plaintiffs' intentional infliction of emotional distress claim against all Defendants.

## III. DISCUSSION

### A. Counts I and II: Unlawful Seizure of G.L.

Defendants argue Plaintiffs' Fourth Amendment Unlawful Seizure claims based on G.L.'s seizure and continued separation from his parents are barred by the law of the case and *Rooker-Feldman* doctrines.

#### 1. Count I: Seizure Prior to Juvenile Court's Probable Cause Determination (from July 12 to July 13, 2023)

"The law of the case doctrine is a flexible rule, which 'merely expresses the practice of courts generally to refuse to reopen what has been decided . . . .'; it is 'not a limit on their power.'" *Monfils v. Taylor*, 165 F.3d 511, 520 (7th Cir. 1998) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). "It is, however, a rule of practice, based on sound policy. . . . Once an issue is litigated and decided, that should be the end of the matter." *Id.* (internal quotation marks omitted).

Defendants contend the doctrine bars Plaintiffs from relitigating whether the seizure of G.L. prior to the juvenile court hearing was supported by probable cause. The Court previously determined there was probable cause to take G.L. into protective

custody: "[A] reasonable caseworker could have believed G.L. faced an immediate threat of abuse at the time of the seizure." (Doc. 43 at 10). As part of its analysis, the Court did not consider Dr. Petrak's July findings regarding G.L. because—based on the allegations in the first complaint—they were interpreted to have been communicated to DCFS *after* the seizure occurred. *See Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011) (the probable cause analysis requires focus "on the facts and circumstances known to defendants at the time they decided to remove [the minor], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the minor] faced an immediate threat of abuse based on those facts").

The instant allegations now include that Dr. Petrak's findings had been communicated to Hamm prior to G.L.'s seizure. (Doc. 48 at ¶ 14). "An amended complaint supersedes an original complaint and renders the original complaint void." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004). However, "with respect to allegations that did not change from the original complaint," the court will, "consistent with the law of the case, stick to those prior rulings." *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1013) (N.D. Ill. Sep. 30, 2024).

The Court based its previous probable cause determination on the concerns of treating physicians (NP Elliot and the admitting physician at St. John's Hospital)[7] as well as apparent inconsistencies among explanations provided by each parent regarding

[7] The allegation concerning the physician at St. John's Hospital was removed from the amended complaint, and, therefore, not considered here. *See Flannery*, 354 F.3d at 638 n.1. Even if the allegation was considered, the Court would still find a question of reasonable dispute exists as to whether there was probable cause to seize G.L.

G.L.'s markings. Here, accepting the well-pleaded, amended allegations as true—particularly that Dr. Petrak's findings (that there were no signs of abuse or neglect) were communicated to Hamm just prior to G.L.'s seizure and Hamm knew of these findings at the time (Doc. 48 at ¶¶ 144–45)—the Court finds Plaintiffs have stated a claim. *See Vincent v. City of Colleges of Chicago*, 485 F.3d 919, 924 (7th Cir. 2007) ("If [a specific fact] is essential to prevail, then [the plaintiff] must prove it eventually, but it need not be alleged; only the *claim*—which is to say, enough to alert the defendant to the nature of the grievance—need be pleaded."); *see also Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000) (the existence of probable cause is a jury question unless "there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them" (internal quotation marks omitted)).

**2. Count II: Seizure After Juvenile Court's Probable Cause Determination (from July 13 to October 3, 2023)**

Under the *Rooker-Feldman* doctrine, federal courts other than the United States Supreme Court lack jurisdiction to review decisions of state courts. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482–86 (1983)). The Supreme Court established a four-element test governing when the doctrine will bar a lower court's federal jurisdiction:

> *First*, the federal plaintiff must have been a state-court loser. *Second*, the state-court judgment must have become final before the federal proceedings began. *Third*, the state-court judgment must have caused the alleged injury underlying the federal claim. *Fourth*, the claim must invite the federal district court to review and reject the state-court judgment.

*Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 766 (7th Cir. 2024) (en banc) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).[8] As for the fourth element, Defendants contend Plaintiffs' claim "necessarily requires this Court to review the findings made by the juvenile court." (Doc. 60 at 4). The Court disagrees.

Plaintiffs ask this Court to award them damages based on the constitutional violations committed by Defendants that led to the juvenile court's determination that protective custody was appropriate and the detention of G.L. thereafter. The en banc majority in *Gilbank*[9] explained there is no *Rooker-Feldman* bar when a plaintiff's suit will not "modify" a resolved state-court judgment. *Id.* at 791 (Kirsch, J., concurring in part and dissenting in part). In that case, the en banc majority held *Rooker-Feldman* did not bar federal jurisdiction where the plaintiff, after regaining custody of her daughter, sought damages in federal court for constitutional violations committed by local officials during a since resolved custody dispute. The en banc majority explained:

> Gilbank's suit cannot and will not modify the since resolved custody judgment. . . . Her damages suit does not seek to undo any state court judgment. Nor could it: ever since Gilbank regained custody of her daughter, the state custody proceedings have closed. She could not appeal an order depriving her of custody after she regained custody. The case and the custody issue are over. Gilbank's federal suit, by contrast, can give her meaningful relief. Doing so might result in a federal court frowning upon the state court's conclusions. But that is decidedly not a *Rooker-Feldman* problem.

---

[8] In this circuit, a fifth element applies, namely, the plaintiff had a "reasonable opportunity to raise her federal issues in the state courts." *Gilbank*, 111 F.4th at 766 (citing *Andrade v. City of Hammond*, 9 F.4th 947, 950 (7th Cir. 2021)).

[9] A majority of the reviewing judges joined Part I of Judge Kirsch's opinion in *Gilbank*, making it the en banc majority opinion relevant here. *Gilbank*, 111 F.4th at 760.

*Id.* at 791 (Kirsch, J.). Because the Plaintiffs here only seek money damages—the suit cannot modify, overturn, or undo the relief granted by the juvenile court. *See id.* at 793–94 (Kirsch, J.). Accordingly, *Rooker-Feldman* does not bar the claim. Defendants' Motion to Dismiss is denied as to this count.

**B. Count III: Substantive Due Process Right to Make Medical Decisions**[10]

G.L.'s parents, as next-best-friends of G.L., raise a substantive due process claim on the basis that G.L. was deprived of his right to make his own medical decisions when he was denied his mother's breastmilk and a feeding tube was medically inserted into him. But "the Supreme Court has strongly suggested that minor children lack a liberty interest in directing their own medical care." *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 414–15 (6th Cir. 2019) (citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990); *Schall v. Martin*, 467 U.S. 253, 265 (1984)). Indeed, the Court has explained that "[c]hildren, by definition, are not assumed to have the capacity to take care of themselves" and "are assumed to be subject to the control of their parents." *Schall*, 467 U.S. at 265.

Even if children were entitled to a substantive due process right to make their own medical decisions (let alone having the capacity to do so), the right was not so "clearly established" to remove Defendants' qualified immunity. Indeed, defendants "receive qualified immunity unless they could have 'read' the relevant precedent beforehand and

---

[10] In their response to the motion to dismiss under this count, Plaintiffs appear to raise a state-created-danger claim based on the allegations. (Doc. 71 at 16–17, 29). *See King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007) (elements of the claim). Because Plaintiffs are not required to plead legal theories, only "facts sufficient to show that the case is plausible," and Defendants do not contest the claim, the state-created-danger claim stands. *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010).

'know[n]' that it proscribed their specific conduct." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (quoting *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule that plaintiff seeks to apply.'" *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

Plaintiffs contend "it is established precedent that forced medical treatment violates the rights of children" (Doc. 71 at 29), relying on *Parham* and *Cruzan*, but those cases simply did not define the right—whether with a high degree of specificity or not—that children may make their own medical decisions. *See Parham v. J.R.*, 442 U.S. 584, 600 (1979); *Cruzan*, 497 U.S. at 279–80. In *Parham*, the Supreme Court held that "a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment." *Parham*, 442 U.S. at 600. And the Court later explained that in *Parham*, it "certainly did not intimate that [] a minor child, after commitment, would have a liberty interest in refusing treatment." *Cruzan*, 497 U.S. at 279 (citing *Parham*, 442 U.S. at 600). In *Cruzan*, the Court reasoned that although competent individuals *might* have "an interest in refusing life-sustaining medical treatment," incompetent individuals do not. *Cruzan*, 497 U.S. at 279–81; *see also Wash. v. Glucksberg*, 521 U.S. 702, 724–25 (1997) (discussing *Cruzan*). It is worth noting, too, that Plaintiffs do not rely on *Cruzan*'s majority, but rather the case's concurring and dissenting opinions. Ultimately, G.L.'s so-called right was not "clearly established" by "relevant precedent." *Zorn*, 146 S. Ct. at 930. Even if the substantive due process right exists, Defendants are thus entitled to qualified

immunity on this claim.[11] *See Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (internal quotation marks omitted) (a claim "may be dismissed under 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred").

**C. Count IV: "Fourteenth Amendment"**

In Count IV, Plaintiffs allege substantive and procedural due process claims. Plaintiffs raise a substantive due process claim "premised on G.L.'s continued seizure" violative of his parents' familial rights.[12] (Doc. 71 at 19 (quotation); Doc. 48 at ¶¶ 172–73). The Court previously denied Defendants' motion to dismiss this claim as, "accepting all well-pleaded facts as true, a reasonable caseworker could have believed that reasonable suspicion and even probable cause dissipated after the initial seizure." (Doc. 43 at 14). The claim stands.

Plaintiffs' procedural due process claim is premised on Defendants' removal of G.L. without due process based on their alleged fabrication and suppression of evidence. *See Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1021 (7th Cir. 2000) ("Because [the minor-

---

[11] Insofar as Defendants attempt to raise a qualified immunity defense to any other claims, the Court declines, for now, to make a determination. *See, e.g., Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020) (citation omitted) (the pleading stage is not "always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim").

[12] To the extent that Plaintiffs attempt to raise a substantive due process claim based on the initial seizure of G.L., the claim is barred under the law of the case. *Monfils*, 165 F.3d at 520. The Court previously dismissed this portion of Plaintiffs' claim because "substantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon." *Brokaw v. Mercer County*, 235 F.3d 1000, 1017 (7th Cir. 2000); *see also United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). "Allegations concerning the initial removal of a child . . . are evaluated under the Fourth Amendment." (Doc. 43 at 13 n.4.). *Xiong v. Wagner*, 700 F.3d 282, 291 n.2 (7th Cir. 2012).

plaintiff] claims that he was removed based on knowingly false statements of child neglect, and that the defendants removed him from his home without an investigation, a pre-deprivation hearing, or exigent circumstances, he has stated a procedural due process claim."). Defendants do not challenge the merits of this claim, rather they argue Defendant Hamm is entitled to absolute immunity.

Relying on *Millspaugh v. Cnty. Dep't of Pub. Welfare*, 937 F.2d 1172, 1176 (7th Cir. 1991), this Court previously found that absolute immunity protected Hamm from suit insofar as any claim hinges on her "testimony and other steps taken to present the case for decision by the [juvenile] court." (Doc. 43 at 16). Plaintiffs contend the amended allegations clarify "that *during the investigation* Hamm fabricated evidence which the CCSAO later used to commence judicial proceedings against Plaintiffs and to secure G.L.'s continued seizure" and "Hamm also did not disclose to the CCSAO the exculpatory evidence that conclusively established G.L. was not abused" (Doc. 71 at 21) (emphasis in original), so absolute immunity does not apply.

Although the *Millspaugh* Court held that "testimony and other steps taken to present the case for decision by the court" are acts wherefrom social workers and like public officials receive absolute immunity, it went on to say that the caseworker's "application for the order initiating the case, and her journey to Indianapolis to obtain custody of the children, call for different analysis." 937 F.2d at 1176. The Court likened the caseworker's investigative acts (*i.e.*, "the gathering of evidence"), which include the "collect[ion] of the children," to that of a police officer "seizing evidence on the authority

of a warrant." *Id.* And those acts, the Court said, are "covered by qualified immunity only." *Id.* at 1176–77 ("Absolute immunity is appropriate when the social worker presents the case to a court. . . . Qualified immunity applies to the seizure of the children in Indianapolis.").

The Court further explained "the dividing line between absolute and qualified immunity is whether the injury depends on the judicial decision. If there would be no loss but for the judge's acts, then the prosecutor or witness who induces the judge to act has absolute immunity." *Id.* at 1175. Therefore, here, Hamm's alleged extrajudicial acts in withholding evidence and fabricating evidence that she provided to the CCSAO—her presentation of evidence to the CCSAO—that the CCSAO later used in its case before the juvenile court, are covered only by qualified immunity doctrine. Hamm's presentation to the CCSAO may have yielded harm to Plaintiffs notwithstanding the judicial determination. For example, as alleged here, G.L.'s parents could have been prosecuted in the absence of probable cause (in reliance on Hamm's false representations), which could lead to injury prior to a court's ruling. Hamm's presentation to the CCSAO, moreover, is much like a police officer's presentation to a prosecutor, who then reviews and uses the officer's report. *See Washington v. Haupert*, 481 F.3d 543, 551 (7th Cir. 2007) (analyzing whether qualified immunity covered police officers' fabrication of a police report to justify arrests); *see also Gruenberg v. Gempeler*, 697 F.3d 573, 578 (7th Cir. 2012) ("Qualified immunity shields government officials from liability under Section 1983 for *actions taken while performing discretionary functions*, unless their conduct violates clearly

established statutory or constitutional rights of which a reasonable person would have known." (internal quotation marks omitted) (emphasis added)); *Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)) (prosecutors are entitled to absolute immunity for "professional evaluation of the evidence assembled by the police" but—like the police—are only qualifiedly immune for investigatory acts). These investigatory acts are sufficiently extrajudicial to afford Hamm only with qualified immunity.

On that note, to the extent that any of Plaintiffs' claims against Hamm are premised on her testimony in court, she is absolutely immune; insofar as any claim is premised on her gathering of evidence or initial seizure of G.L., she may be qualifiedly immune but not absolutely. *Millspaugh*, 937 F.2d at 1176–77. The Court makes no qualified immunity decision at this stage of the case. *See Hanson*, 967 F.3d at 589.

**D. Count V: § 1985(3) Conspiracy**

"A plaintiff raising a claim under § 1985(3) must allege (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right of privilege granted to U.S. citizens." *Brokaw*, 235 F.3d at 1024 (internal quotation marks omitted). Plaintiffs fail to state a conspiracy claim for two primary reasons: they do not allege any purpose under the second prong, and the claim is otherwise barred under the intra-corporate immunity doctrine.

"To establish that the purpose of the conspiracy is to 'deprive a person or class of persons of equal protection of the laws,' the plaintiff must allege 'some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). "Class-based invidiously discriminatory animus" includes "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty." *Id.* (internal quotation marks omitted).

Nowhere in Count V (or elsewhere in their amended complaint) do Plaintiffs allege any racial or otherwise class-based invidiously discriminatory animus (the purpose) motivating the conspiracy. Plaintiffs simply state, "Defendants conspired for the purpose of depriving the Plaintiffs of Equal Protection of the law." (Doc. 48 at ¶ 190). Rather, in response to the motion to dismiss, Plaintiffs set forth—for the first time—a discriminatory purpose: "Defendants conspired . . . because [Plaintiffs are] Hispanic." (Doc. 71 at 22).

Plaintiffs insist that any reading of the amended complaint makes the discriminatory animus of the conspiracy clear: "the word 'Spanish' is stated ten times [in the amended complaint] in reference to the Plaintiffs' language of origin;" Defendants failed "to ensure G.L.'s placement in foster homes where Spanish was spoken;" and Plaintiffs were not afforded translators or a Spanish-speaking caseworker, among other supposed indications of racial animus. (*Id.*). But, again, Plaintiffs do not allege Defendants' conspiratorial actions were motivated by some animus towards Plaintiffs'

ethnicity. Plaintiffs cannot amend their complaint in response to a motion to dismiss. *Guajardo v. Skechers USA, Inc.*, 503 F. Supp. 3d 746, 756–57 (C.D. Ill. 2020) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011)). And the allegations, taken as true, are insufficient to put Defendants on notice of their wrongful conduct—no defendant is alleged to have taken any action because Plaintiffs are Hispanic, nor that the collective purpose of the conduct was this ethnic animus. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope" to suffice Rule 8(a)'s notice pleading requirements).

The intra-corporate immunity doctrine also bars the claim. Under the doctrine, a conspiracy cannot exist between members of the same entity, such as DCFS, when its members act within the scope of their employment. *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994); *see also Strauss v. City of Chicago*, 346 F. Supp. 3d 1193, 1210 (N.D. Ill. 2018). Plaintiffs' reliance on language from the Seventh Circuit that "numerous acts undertaken by several corporate agents" and the "nature of the discriminatory activity may require that the doctrine be avoided" is misplaced. *See Hartman v. Board of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993) (citing *Volk v. Coler*, 945 F.2d 1422, 1435 (7th Cir. 1988); *Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990)). The Court explained that it later

"rejected the idea that the doctrine is avoided merely because the alleged conspiracy involves more than one discriminatory act." *Id.* (citing *Travis*, 921 F.3d at 110). Moreover, the "nature of the discriminatory activity" language concerned a case where the Court rejected Ku Klux Klan members' attempt to avoid liability by incorporating since "they would still be trying to organize . . . multiple centers of social or economic influence . . . ." *Id.*; *see also Travis*, 921 F.2d at 110 (citing *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972)) ("All *Dombrowski* concluded, and all we reiterate, is that managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory."). Here, Defendants acted within the scope of their employment with DCFS and there are no allegations showing each Defendants' personal animus towards Plaintiffs based on their ethnicity. *See Bank of Am.*, 725 F.3d at 818. Accordingly, for the above reasons, Count V is dismissed.

**E. Count VI: Federal Malicious Prosecution**

G.L.'s parents bring a § 1983 malicious prosecution claim under the Fourth Amendment. Plaintiffs, however, concede that they have incorrectly pleaded the federal claim as one arising under the Fourth Amendment. (Doc. 71 at 26). Indeed, any Fourth Amendment malicious prosecution claim must be premised on the defendant's seizure of the plaintiff without probable cause, *Thompson v. Clark*, 596 U.S. 36, 42, 43 n.2 (2022), and G.L.'s parents were not seized. *See Carter v. Cook Cnty. Sheriff*, 142 F.4th 897, 903 (7th Cir. 2025); *see also Manuel v. City of Joliet*, 580 U.S. 357, 365–66 (2017) (*Manuel I*).

In conceding that they failed to plead the correct legal theory, Plaintiffs contend they have pleaded a federal malicious prosecution claim under the Fourteenth Amendment and that G.L. has a viable Fourth Amendment claim under *Manuel I*.[13] "[C]omplaints need not identify the applicable law," *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017), or "allege each element that the plaintiff eventually will need to prove," *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336 (7th Cir. 2024); *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal."). Defendants do not contest the viability of G.L.'s claim under *Manuel I*—and so have waived dismissal—but they do contest his parents' Fourteenth Amendment malicious prosecution claim.

Under Seventh Circuit precedent, where an adequate remedy for a plaintiff's malicious prosecution exists under state law, the federal claim under the Fourteenth Amendment must be dismissed. *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013). Here, Plaintiffs bring a malicious prosecution claim under Illinois law (Count VII) and "Illinois law recognizes tort claims for malicious prosecution."[14] *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) (citing *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (Ill. 1996)). Therefore,

---

[13] *Manuel I* reasoned that detention of a plaintiff absent probable cause after legal process has occurred—"when, for example, a judge's probable cause determination is predicated solely on a police officer's false statements"—infringes upon the Fourth Amendment. 580 U.S. at 367–38 ("Manuel stated a Fourth Amendment claim when he sought relief not merely for his (pre-legal-process) arrest, but also for his (post-legal-process) pretrial detention."); *see also Manuel v. City of Joliet*, 903 F.3d 667, 670 (2018) (*Manuel II*) ("The wrong of detention without probable cause continues for the duration of the detention.").

[14] Although Plaintiffs' state law malicious prosecution claim is barred by Illinois's sovereign immunity, *see Healy v. Vaupel*, 133 Ill. 2d 295, 309 (Ill. 1990); *T.S. v. Cnty. of Cook*, 67 F.4th 884, 891–92 (7th Cir. 2023), as discussed in further detail below, Plaintiffs have an adequate remedy through the Illinois Court of Claims. *See T.S.*, 67 F.4th at 891 (citing 705 ILCS 505/8(a)).

G.L.'s parents' malicious prosecution claim under the Fourteenth Amendment is dismissed.

**F. Counts VII and VIII: State Law Claims**

Plaintiffs raise claims for malicious prosecution and intentional infliction of emotional distress ("IIED"). This Court previously dismissed the IIED claim with prejudice after finding Plaintiffs' state law claims were against Illinois and thus barred by sovereign immunity.[15] (Doc. 43 at 18–20). The claim is now barred by the law of the case doctrine as well and must be dismissed. *See Monfils*, 165 F.3d at 520.

Plaintiffs did not raise the malicious prosecution claim in their first complaint, but that claim, too, is against Illinois. Although Plaintiffs raise the independent-duty exception to state sovereign immunity, *see T.S.*, 67 F.4th at 892, the exception does not apply here as a Child Welfare Employee License ("CWEL") does not "create[] an independent duty on the part of [DCFS employees] to take reasonable care when conducting investigations of child neglect and abuse." *Paulinski v. Link*, 2026 IL App (1st) 250326, ¶¶ 21–23 ("DCFS developed the CWEL license solely for the purpose of employment with DCFS. It is only by virtue of their employment at DCFS that these licensed defendants had an obligation to investigate Madalyne's case according to certain articulated standards."). The same is true for the Abused and Neglected Child Reporting

[15] Illinois sovereign immunity applies when "there are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State." *Healy*, 133 Ill. 2d at 309 (internal quotation marks omitted).

Act ("ANCRA"), 325 ILCS 5/4. *See Williams v. Haleighs Hope, Inc.*, No. 22-cv-3090, 2025 U.S. Dist. LEXIS 44023, at *11–12 (C.D. Ill. Mar. 11, 2025) (citing *T.S.*, 67 F.4th 884) (reasoning that ANCRA and the CWEL do not impose a duty owed to the public on DCFS employees that is independent from their employment). Accordingly, Plaintiffs' state-law claims are dismissed with prejudice.

## IV. CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss (Doc. 59) is GRANTED in part and DENIED in part. Consistent with this Opinion, Counts III and V are DISMISSED; Count VI is DISMISSED to the extent that Tapia and Lucha raise a federal malicious prosecution claim; Counts VII and VIII are DISMISSED with prejudice. To the extent Plaintiffs have identified and pursue additional legal theories beyond those enumerated with each count, the Court directs the parties to those portions of the Opinion. Plaintiffs are granted leave to file a second amended complaint, if appropriate, within 21 days from the date of this Order. The Clerk is directed to amend Defendant Angela Westlake's name in the docket to "Angie Hamm," Defendant Tiffany Nowacki's name to "Tiffany Baker," and Defendant Jenny Mezroth's name to "Jenny Metzroth."

ENTER: September 23, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE